## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

COREY F. MALDONADO,       )
                                    )
                 Petitioner,    )
                                    )
              v.           )      1:19CV671
                                    )
ERIK A. HOOKS, Secretary,   )
North Carolina Department of  )
Public Safety, et al.,       )
                                    )
               Respondents.   )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1; see also Docket Entry 2 ("Petitioner['s] Supporting Affidavit").) Respondent has moved to dismiss on grounds of untimeliness. (Docket Entries 5, 6.) For the reasons that follow, the Court should grant Respondent's Motion to Dismiss and dismiss the Petition as untimely.

### I. Procedural History

On April 7, 2005, in the Superior Court of Rowan County, Petitioner pled guilty to first degree murder in case 03CRS58341. (See Docket Entry 1, ¶¶ 1, 4, 6; see also Docket Entry 6-2.) In accordance with the plea agreement (see Docket Entry 6-2 at 3), the state dismissed the attempted robbery with a dangerous weapon and conspiracy to commit robbery with a firearm charges (see id. at 5), and the trial court sentenced Petitioner to life in prison without

the possibility of parole (see Docket Entry 1, ¶ 3; see also Docket Entry 6-3).[1] Petitioner did not appeal. (See Docket Entry 1, ¶ 8.)

Many years later, Petitioner submitted a pro se motion for appropriate relief ("MAR") to the trial court (see Docket Entry 1, ¶¶ 10, 11(a); see also Docket Entry 6-5), which Petitioner dated as signed on October 19, 2018, (see Docket Entry 6-5 at 48-50), and which that court accepted as filed on November 5, 2018 (see Docket Entry 6-6 at 2 (order denying MAR reflecting MAR's filing date)). The trial court denied Petitioner's MAR on December 20, 2018. (See Docket Entry 1, ¶ 11(a)(7), (8); see also Docket Entry 6-6 at 2-4.) Subsequently, Petitioner submitted a petition for writ of certiorari to the North Carolina Court of Appeals seeking review of the trial court's denial of Petitioner's MAR (see Docket Entry 1, ¶ 11(b); see also Docket Entry 6-7), which Petitioner signed as dated on January 9, 2019 (see Docket Entry 6-7 at 29-31), and which that court accepted as filed on January 18, 2019 (see Docket Entry 1, ¶ 11(b)(3); see also Docket Entry 6-7 at 2). The Court of Appeals denied that petition on January 24, 2019. (See Docket Entry 1, ¶ 11(b)(7); see also Docket Entry 6-8 at 2.) Petitioner sought review of the Court of Appeals's denial of his certiorari petition via a petition for discretionary review ("PDR") in the

---

[1] Throughout this Memorandum Opinion, pin citations to page numbers refer to the page numbers that appear in the footer appended to documents upon their docketing in the Court's CM/ECF system.

North Carolina Supreme Court (see Docket Entry 1, ¶ 11(c); see also Docket Entry 6-9), which he dated as signed on February 11, 2019 (see Docket Entry 6-9 at 41-43), and which that court accepted as filed on February 26, 2019 (see Docket Entry 1, ¶ 11(c)(3), see also Docket Entry 6-9 at 2).   The North Carolina Supreme Court dismissed the PDR by order dated May 9, 2019.   (See Docket Entry 1, ¶ 11(c)(7), (8); see also Docket Entry 6-10.)

Petitioner then submitted the instant Petition on or about June 20, 2019.   (See Docket Entry 1-1 (reflecting date of June 20, 2019, on cover letter conveying instant Petition).)[2]   Respondent moved to dismiss on grounds of untimeliness (Docket Entries 5, 6), and Petitioner responded in opposition (Docket Entry 8).   For the reasons that follow, the Court should grant Respondent's Motion to Dismiss, because Petitioner submitted his Petition outside of the one-year limitations period.

## II. **Grounds for Relief**

The Petition raises four grounds for relief:

1) "[t]o obtain the felony murder plea the state was not required to establish all of the essential element [sic] of the plea of first degree felony murder indictment [sic]" (Docket Entry 1, ¶ 12(Ground One); see also id.,

_____

[2] Ordinarily, under Rule 3(d) of the Rules Governing Section 2254 Cases in United States District Courts, the Court deems Section 2254 petitions as filed on the date the petitioner signs the petition, under penalty of perjury, as submitted to prison authorities.   In this case, the Petition reflects "6/ /19" as the date Petitioner submitted the instant Petition to prison authorities (Docket Entry 1 at 15) and thus the Court could use the date the Clerk's office stamp-filed the document, i.e., July 1, 2019 (see Docket Entry 1 at 1), as the filing date.   However, as described in more detail below, even if Petitioner had submitted the Petition to prison authorities as early as June 20, 2019, those extra 11 days would make no difference in the timeliness analysis.

¶ 12(Ground One)(a) (alleging as "[s]upporting facts" that "the state was allowed to only satisfy only [sic] one of the essential elements; while dismissing the underlying felony offence [sic]"));

2) "fundamental miscarriage of justice" (id., ¶ 12(Ground Two)) "for those reasons set out in the attached affidavit and corporated [sic] [MAR], petition for certiorari and [PDR] issue [sic], referred to herein by reference as if fully set out herein" (id., ¶ 12(Ground Two)(a));

3) "ineffective assistance of counsel" (id., ¶ 12(Ground Three)), in that "counsels [sic] ill-adviced [sic] induced this [P]etitioner into duress, and into a [sic] involuntary plea and withheld intervening causes of the alleged victim's death" (id., ¶ 12(Ground Three)(a)); and

4) "the trial court allowed co-defendant's testimonial hearsay statement to be used as the factual basis for the plea" (id., ¶ 12(Ground Four); see also id., ¶ 12(Ground Four)(a) (referencing "corporated [sic] [MAR], petition for writ of certiorari and [PDR], and attached affidavit" as setting out "[s]upporting facts").[3]

### III. Discussion

Respondent seeks dismissal of the Petition on the grounds that Petitioner filed it outside of the one-year limitations period of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), see 28 U.S.C. § 2244(d)(1). (See Docket Entry 6 at 3-16.) In order to assess Respondent's statute of limitations argument, the Court must first determine when Petitioner's one-year period to file his Petition commenced. The United States Court of Appeals for the Fourth Circuit has explained:

---

[3] For ease of reading, when quoting from Petitioner's filings, the Court applies standard capitalization conventions.

4

Under § 2244(d)(1)(A)-(D), the one-year limitation period begins to run from the latest of several potential starting dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Green v. Johnson, 515 F.3d 290, 303-04 (4th Cir. 2008). The Court must determine timeliness on claim-by-claim basis. See Pace v. DiGuglielmo, 544 U.S. 408, 416 n.6 (2005).

Respondent correctly contends that the Petition qualifies as untimely under subparagraph (A). (Docket Entry 6 at 3-7.)[4] North

---

[4] Neither Petitioner nor Respondent argue that subparagraphs (B), (C), or (D) apply in this situation. (See Docket Entries 1, 2, 6, 8.) Moreover, the plain language of subparagraphs (B) and (C) confirms that they have no possible application, as Petitioner's Grounds for Relief do not assert a state-created "impediment to filing" the instant Petition, 28 U.S.C. § 2244(d)(1)(B), or invoke a new "constitutional right" recognized by the United States Supreme Court and "made retroactively applicable to cases on collateral review," 28 U.S.C. § 2244(d)(1)(C). Furthermore, subparagraph (D) could not apply because Petitioner knew, or through exercise of due diligence should have known, of the factual predicates of Grounds for Relief One and Four since the time of his guilty plea and judgment on April 7, 2005. (See Docket Entry 1, ¶ 12(Ground
(continued...)

5

Carolina limits the ability of individuals who plead guilty to appeal their convictions as a matter of right. See N.C. Gen. Stat. § 15A-1444. Here, the trial court sentenced Petitioner to life in prison without the possibility of parole (see Docket Entry 6-3), and that sentence constituted the only lawful sentence other than death for a Class A felony, regardless of prior record level, see N.C. Gen. Stat. § 15A-1340.17(c) (version effective from December 1, 1997, to November 30, 2009, applicable to Petitioner's offense on August 11, 2003). Therefore, Petitioner could not appeal his conviction as a matter of right, see N.C. Gen. Stat. § 15A-1444(a1), and Petitioner's conviction finalized under

---

[4](...continued) One), (Ground Four).) To the extent Petitioner bases Grounds Two and Three on his allegation that, at the time of his plea, his trial counsel conspired with the prosecution to withhold from Petitioner the fact that the victim's wife removed life support from the victim, i.e., the alleged intervening cause, Petitioner still has not shown that subparagraph (D) applies. "[P]etitioner bears the burden of proving that he exercised due diligence, in order for the statute of limitations to begin running from the date he discovered the factual predicate of his claim . . . ." DiCenzi v. Rose, 452 F.3d 465, 471 (6th Cir. 2006). In his filings, Petitioner does not state when he supposedly first learned that the victim survived for ten weeks in hospital after the shooting until the victim's wife removed life support (see Docket Entries 1, 2, 6-5, 6-7, 6-9, 8), stating only that "the prosecuting attorney and defence [sic] attorneys . . . didn't disclose [the fact that the victim's wife removed life support] to the trial court []or to [ P]etitioner until after the plea had been accepted by the trial judge when this portion of the discovery was provided to [ P]etitioner" (Docket Entry 8 at 3). Absent such allegations, Petitioner has not demonstrated the necessary "due diligence" for application of subparagraph (D). See Freeman v. Zavaras, 467 F. App'x 770, 775 (10th Cir. 2012) (refusing to apply subparagraph (D) where petitioner failed to explain why he could not have discovered factual predicate of claim earlier); Farabee v. Clarke, No. 2:12CV76, 2013 WL 1098098, at *3 (E.D. Va. Feb. 19, 2013) (unpublished) (finding subparagraph (D) inapplicable where the petitioner's "threadbare" allegations failed to explain inability to discover predicate earlier), recommendation adopted, 2013 WL 1098093 (E.D. Va. Mar. 13, 2013) (unpublished); Norrid v. Quarterman, No. 4:06CV403, 2006 WL 2970439, at *1 (N.D. Tex. Oct.16, 2006) (unpublished) (concluding that the petitioner bore burden of demonstrating applicability of subparagraph (D)); Frazier v. Rogerson, 248 F. Supp. 2d 825, 834 (N.D. Iowa 2003) (refusing to apply subparagraph (D) when the petitioner "never identifie[d] when or how he discovered his 'new evidence'"). Accordingly, subparagraph (D) does not apply.

6

subparagraph (A) on April 7, 2005 - the day the trial court signed the judgment and commitment forms in his criminal case (see Docket Entry 6-3). See Hairston v. Beck, 345 F. Supp. 2d 535, 537 (M.D.N.C. 2004) (finding that, because the petitioner lacked right to appeal, limitation period ran from day of judgment) (Osteen, Sr., J., adopting recommendation of Dixon, M.J.).[5]

Petitioner's one-year period under AEDPA then ran, unimpeded, from April 7, 2005, until it expired one year later on Friday, April 7, 2006. Because Petitioner did not file the instant Petition until, at the earliest, June 20, 2019, that filing remains more than 13 years out of time. Moreover, because (as detailed above) Petitioner submitted all of his post-conviction filings well after AEDPA's one-year statute of limitations had already run, none of those belated filings could toll the limitations period, see Minter v. Beck, 230 F.3d 663, 665 (4th Cir. 2000) (finding that state filings made after expiration of federal limitations period do not restart or revive that period).

In the paragraph of the Petition that directs Petitioner to "explain why the one-year statute of limitations as contained in [AEDPA] does not bar [his P]etition," Petitioner states as follows:

_____

[5] Further, "[e]ven if Petitioner had a right to appeal, [] it would have fully expired [14] days later on Thursday, [April 21], 2005." (Docket Entry 6 at 4 (citing N.C. R. App. P. 4(a)(2) (allowing 14 days to appeal from criminal judgment)).) Accordingly, even including a right to appeal, Petitioner's judgments finalized, at the latest, on April 21, 2005. See Gonzalez v. Thaler, 565 U.S. 134, 149-50 (2012) (holding that a petitioner's case becomes final when the time for pursuing direct review expires). Those 14 extra days would not affect the timeliness analysis.

(1). Petitioner suffers from a fundamental miscarriage of justice, (2) Petitioner is actual factual innocence [sic], via intervening causes asserted state failed to establish all essential elements of the underlying offense, (3) mental delayed [sic] as asserted in exhausted state court filing, judicial notice requested as to those corporated [sic] filings [sic] issues and questions presented therein. Especially mentally delayed after obtaining a G.E.D. as a matter of course provided mentally delaye [sic] individuals, as right to file a timely 2254 issues, as set out in the attached affidavit. As this 2254 petition constitutional issues is [sic] articulated pursuant to Class v. United States, 2018 U.S. Lexis 1378 (2018), also per United States v. Mitchell, 1 F.3d 235 (4th Cir. 1993), given these reasonings [sic] and those circumscribed by Section 15A-2005 applications, which this [P]etitioner suffers from a miscarriage of justice that seizd [sic] his actual innocence by suppression [sic] intervening causes during the plea proceedings from the trial judge in which had the judge been informed of the intervening cause it is likely that the trial court would not [sic] accepted the induced plea, as defense counsel assured [ P]etitioner that he would be executed because the alleged victim was white[.] Even though defense lawyers and prosecution was [sic] aware that the alleged victims [sic] wife took the victim's life which was the primary intervening causes [sic] withheld from the trial judge[,] that the wife ended the alleged victim's life[.]

Also this Petitioner respectfully ask [sic] this honorable [C]ourt to excuse any proposed default, for those reasons asserted in the attached affidavit.

(Docket Entry 1, ¶ 18; see also Docket Entry 2 ("[P]etitioner respectfully seeks leave of the [C]ourt pursuant to McQuggin [sic] v. Perkins, 133 S. Ct. 1924, 1931-32 (2013) standing and exceptions due to his asserted claims of actual and factual innocence, and fundamental miscarriage of justice, and his mentally delayed intelligent disability at the time of his plea . . . . [P]etitioner further subscribe [sic] [] that his acquired guilty plea is the by

8

product of an induced plea agreement [and] that but for asserted constitutional violations no reasonable factfinder would have found [] [P]etitioner guilty of the underlying offense."); Docket Entry 8 at 2 (arguing that the Court should excuse the Petition's untimeliness because (1) "Petitioner is actual and factual innocence [sic]," (2) "he suffers from a fundamental miscarriage of justice," (3) "at the time of [ P]etitioner's offenses came about [sic] that he was mentally delayed and possessed an intellectual function [sic] and disability below 70 I.Q.," and (4) "Petitioner enter [sic] the contested guilty plea under duress and ill-advice [sic] of defense counsel who was laboring under a conflict of interest, with deficient performance constituting structural error inherently").)

Petitioner's pro se filings in this matter, as described above, lack coherence and conflate various different legal concepts, such as fundamental miscarriage of justice/actual innocence, structural error, ineffective assistance of counsel, procedural default, and untimeliness. (See Docket Entries 1, 2, 8.) After liberally construing Petitioner's filings as required by Haines v. Kerner, 404 U.S. 519 (1972), Petitioner appears to allege that 1) he qualifies for the actual innocence exception to the one-year limitations period recognized in McQuiggin v. Perkins, 569 U.S. 383 (2013) (see Docket Entry 1, ¶ 18; see also Docket Entry 2 at 3-8, 18-20; Docket Entry 8 at 1-3, 5-6, 8-13, 15, 16-17); 2) his

9

low IQ and intellectual disability should excuse his late filing (<u>see</u> Docket Entry 1, ¶ 18; <u>see also</u> Docket Entry 2 at 2, 5, 8, 11, 19, 20; Docket Entry 8 at 2, 3, 15); and 3) the ineffective assistance of his trial counsel amounted to structural error that should overcome Petitioner's non-compliance with the statute of limitations (<u>see</u> Docket Entry 1, ¶ 18; <u>see also</u> Docket Entry 2 at 6-19; Docket Entry 8 at 2-7, 16).  As discussed in further detail below, none of those arguments establish a basis for overcoming the Petition's untimeliness.

A.  <u>Fundamental Miscarriage of Justice/Actual Innocence</u>

Petitioner first maintains that he "is actual factual innocence [sic], via intervening causes asserted state failed to establish all essential elements of the underlying offense." (Docket Entry 1, ¶ 18.)  More specifically, Petitioner asserts "that the alleged victim was put to death by his own wife who made an independent decision to end the alleged victim's life after he contracted acute pneumonia" (Docket Entry 2 at 6-7) by "taking him off life support resulting in death . . . after some ten weeks of being hospitalized" (Docket Entry 8 at 12).  In that regard, Petitioner contends that "the asserted intervening causes insulate[d P]etitioner [from] first degree and/or second degree murder culpability and [] the withholding of the asserted intervening causes from the trial judge during the course of accepting [ P]etitioner's plea to first degree murder subject[ed

10

P]etitioner to a fundamental miscarriage of justice." (Id. at 13.) According to Petitioner, the alleged intervening cause satisfies the actual innocence standard of Schlup v. Delo, 513 U.S. 298 (1995) (see Docket Entry 8 at 11-12), and "[a]llows the gate to open even under the McQuiggin[ ] statute of limitations objections" (id. at 12).

The United States Supreme Court has recognized that a showing of actual innocence may excuse noncompliance with the one-year limitations period. See McQuiggin, 569 U.S. at 386. However, the Supreme Court also ruled that showings of actual innocence "are rare," and that a petitioner must demonstrate that no reasonable juror could vote to find the petitioner guilty beyond a reasonable doubt. Id.; see also United States v. Jones, 758 F.3d 579, 583 (4th Cir. 2014) (noting that "substantial claim[s] of actual innocence are extremely rare" (quoting Schlup, 513 U.S. at 321)). Moreover, "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." Schlup, 513 U.S. at 324. The reviewing court must consider "all of the evidence, old and new, incriminating and exculpatory, without regard to whether it would

11

necessarily be admitted under the rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). For the reasons that follow, Petitioner has fallen far short of that stringent standard.

As an initial matter, Petitioner's allegations regarding the circumstances of the victim's death do not qualify as "reliable evidence" and/or a "trustworthy eyewitness account," Schlup, 513 U.S. at 324. For example, Petitioner has failed to offer any proof, beyond his own bald assertions, that the victim survived for ten weeks in hospital, developed acute pneumonia, and died after his wife removed life support. (See Docket Entries 1, 2, 6-5, 6-7, 6-9, 8.) Similarly, Petitioner has not explained the basis of his knowledge of those alleged circumstances. (See id.) Petitioner's failure to proffer "reliable evidence" in support of his actual innocence claim precludes relief. See McDowell v. Lemke, 737 F.3d 476, 483-84 (7th Cir. 2013) (deeming "inherently suspect" the petitioner's "eleventh hour" self-serving affidavits containing no indicia of reliability (internal quotation marks omitted)); Kuenzel v. Allen, 800 F. Supp. 2d 1162, 1181 (N.D. Ala. 2009) ("To permit such self-serving testimony to suffice would set the bar 'so low that virtually every [actual innocence] claimant would pass through it.'" (quoting Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004))).

12

More significantly, however, under North Carolina law, the removal of life support by the victim's wife (if it even occurred) does <u>not</u> constitute new, reliable evidence of Petitioner's actual innocence of the charge of first degree murder of the victim. The appellate courts in North Carolina have long recognized that the "[d]efendant's act does not have to be the <u>sole</u> proximate cause of death," and that "[i]t is sufficient that the act was a proximate cause which in combination with another possible cause resulted in [the victim]'s death." <u>State v. Messick</u>, 159 N.C. App. 232, 237–38, 585 S.E.2d 392, 395 (2003) (emphasis added) (citing <u>State v. Gilreath</u>, 118 N.C. App. 200, 454 S.E.2d 871 (1995), and <u>State v. Minton</u>, 234 N.C. 716, 68 S.E.2d 844 (1952)), <u>aff'd</u>, 358 N.C. 145, 593 S.E.2d 583 (2004). Put another way, "[t]o escape responsibility [for murder] based on an intervening cause, the defendant must show that the intervening act was "the <u>sole</u> cause of death." <u>State v. Holsclaw</u>, 42 N.C. App. 696, 699, 257 S.E.2d 650, 652 (1979) (emphasis added).

The North Carolina Court of Appeals's application of <u>Holsclaw</u>'s "sole cause of death" standard in two later cases provides further clarity as to the state of North Carolina law with regard to intervening causes in the context of murder charges. First, the Court of Appeals reasoned as follows:

> [The d]efendant contends, based on the testimony of [a physician], that [the victim's] refusal to accept a blood transfusion was an independent and intervening cause of death, such as to cut off any responsibility [the]

13

> defendant may have in the victim's death. However, it is
> clear from the evidence that [the victim's] act in
> declining a blood transfusion was not "the sole cause of
> death." [Holsclaw, 42 N.C. App. at 699, 257 S.E.2d at
> 652]. Indeed, all of [the victim's] injuries resulted
> from the stabbing inflicted by [the] defendant. Thus,
> but for [the] defendant's act, [the victim] would not
> have been in need of a blood transfusion.

State v. Welch, 135 N.C. App. 499, 503, 521 S.E.2d 266, 268 (1999).

Subsequently, the Court of Appeals elaborated on Holsclaw as
follows:

> Prior to [the d]efendant's act, [the victim] was a
> healthy, pregnant adult. After the attack, she was in a
> vegetative state, unconscious and in need of hydration
> and nutrition supplied artificially. We do not find
> sufficient evidence to submit the intervening cause
> instruction to the jury, because there is no evidence or
> conflict in the evidence which could support the idea
> that discontinuing artificial hydration and nutrition was
> the sole cause of [the victim]'s death. The evidence is
> clear that [the d]efendant's attack was the proximate
> cause, and any actions by physicians cannot supply a
> defense of sole intervening cause.

State v. Rippy, 210 N.C. App. 760, 711 S.E.2d 531 (2011) (citing

Holsclaw, 42 N.C. App. at 699, 257 S.E.2d at 652–53).

In light of the foregoing authority, Petitioner's unsupported

assertion that removal of life support by the victim's wife

constitutes an intervening cause of the victim's death which

establishes Petitioner's actual innocence of the first degree

murder charge falls short. See Roberts v. Ballard, No. CIV.A.

1:13-23245, 2014 WL 4929403, at *3 (S.D.W. Va. Sept. 30, 2014)

(unpublished) (noting that "numerous courts have concluded that

removal of a victim from life support is not an intervening cause

14

of death sufficient to relieve one from criminal liability" (citing Anderson v. Ignacio, No. 3:98CV655, 2011 WL 294388, at *4-5 (D. Nev. Jan. 26, 2011) (unpublished), Ray v. Commonwealth of Ky., Civ. No. 2005-SC-0241-MR, 2006 WL 2708537, at *1 (Ky. Sept. 21, 2006) (unpublished), State v. Pelham, 176 N.J. 448, 824 A.2d 1082, 1090-91 (2003), Carrigg v. State, 696 N.E.2d 392, 396 (Ind. App. 1998), and State v. Yates, 64 Wash. App. 345, 824 P.2d 519, 523 (1992))).

B.    Low IQ/Intellectual Disability

Petitioner next argues that the Court should excuse the Petition's untimeliness because, "at the time of [ P]etitioner's offenses came about [sic][,] that he was mentally delayed and possessed an intellectual function [sic] and disability below 70 I.Q." (Docket Entry 8 at 2; see also Docket Entry 1, ¶ 18; Docket Entry 2 at 2.)  More specifically, Petitioner asserts that the school records attached to his MAR "reflect that [ P]etitioner's I.Q. equivalent [sic] to a pre-schooler" (Docket Entry 8 at 3 (referencing Docket Entry 6-5 at 69-132)), and "that he possessed not only the I.Q. of a [sic] elamentary [sic] schooler but also the understanding of an elementary [sic] schoole [sic]" (id. at 15). Further, "Petitioner takes objection to [R]espondent's . . . attempting to use [ P]etitioner's subsequent G.E.D scores to equate and to conclusorily infe[r ] that at [sic] time of [ P]etitioner's alleged crime was [sic] committed, and at the time of his plea that

15

[ P]etitioner maintains the same I.Q. as his G.E.D scores, and that he possessed the same capacity to understand that he had a one (1) year statute of limitation to bring his 2254 petition issues." (Id.)

The Court could construe those arguments as an attempt by Petitioner to establish grounds for equitable tolling of the limitations period, see Holland v. Florida, 560 U.S. 631, 649 (2010) (holding that equitable tolling requires proof that "extraordinary circumstance . . . prevented timely filing"). However, Petitioner's reliance on his alleged low IQ and/or intellectual disability to demonstrate entitlement to equitable tolling misses the mark for three reasons.

First, the trial court found during the plea hearing that Petitioner 1) could hear and understand the trial court (see Docket Entry 6-2 at 2); 2) could read and write at a ninth grade level (id.); 3) understood the nature of the charges, defenses to the charges, and the consequences of pleading guilty (id.); 4) entered his guilty plea of his own free will, fully understanding his actions (id. at 3); and 5) had no questions about his plea or his case (id.). Those factual findings carry a presumption of correctness. See 28 U.S.C. § 2254(e). Petitioner's reliance on his school records (see Docket Entry 8 at 3 (referencing Docket Entry 6-5 at 69-132)) does not overcome that presumption, as Petitioner's poor grades and test scores could have resulted from

16

factors such as truancy, tardiness, disciplinary issues, and lack of motivation, rather than from a low IQ and/or intellectual disability.[6]  Moreover, those records do not appear to reflect Petitioner's IQ.  (See Docket Entry 6-5 at 69-132.)

Second, even if Petitioner could overcome that presumption of correctness, the United States Court of Appeals for the Fourth Circuit has made clear that "equitable tolling because of a petitioner's mental condition" applies "only in cases of profound mental incapacity." United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004).  Notably, in so holding, the Fourth Circuit cited a Ninth Circuit decision that limited "equitable tolling based on mental condition" to "exceptional circumstances, such as institutionalization or adjudged mental incompetence." Id. (citing Grant v. McDonnell Douglas Corp., 163 F.3d 1136, 1138 (9th Cir. 1998)).  Petitioner has made no showing that his alleged low IQ and/or intellectual disability resulted in institutionalization or incompetence at any time, let alone during the limitations period. See Allen v. Bell, 250 F. App'x 713, 716 (6th Cir. 2007) (denying inmate who alleged low IQ equitable tolling because he failed to

_____

[6] Petitioner's school records consistently reflect high numbers of absences and tardies.  (See Docket Entry 6-5 at 71 (53 absences and 99 tardies in academic year 1993-94 (second grade - repeated)), 73 (21 absences and 107 tardies for 1994-95 (third grade)), 75 (40 absences and 60 tardies for 1995-96 (fourth grade)), 80 (62 absences and 85 tardies for 1996-97 (fifth grade)), 86 (44 absences and 74 tardies for 1992-93 (second grade)), 89 (19 absences and 91 tardies in 1991-92 (first grade)), 97 (59 absences and 72 tardies in 1998-99 (sixth grade - repeated)), 99 (48 absences and 68 tardies in 1997-98 (sixth grade)), 106 (62 absences and 98 tardies in 1999-2000 (eighth grade)), 108 (64 absences and 4 tardies in 2000-01 (ninth grade)).)

17

"ma[ke] any factual showing of mental incapacity"); <u>Diamond v.</u> <u>Clarke</u>, No. 7:18CV580, 2019 WL 4546918, at *3 (W.D. Va. Sept. 19, 2019) (unpublished) (same).

Third, Petitioner has failed to allege any facts showing how his alleged low IQ and/or intellectual disability actually prevented him from timely filing the instant Petition. <u>See</u> <u>House</u> <u>v. Clarke</u>, No. 3:16CV238, 2017 WL 990580, at *4 (E.D. Va. Mar. 14, 2017) (unpublished) (finding equitable tolling inapplicable where the petitioner did not show how his mental condition prevented him from timely filing). Specifically, Petitioner has not explained in any meaningful way why he could not, with due diligence, have made all appropriate filings before his one-year, post-conviction limitation period expired despite his issues. (<u>See</u> Docket Entry 1, ¶ 18; <u>see also</u> Docket Entries 2, 8.) For example, Petitioner has failed to detail his efforts to obtain assistance before the expiration of his one-year federal filing period. (<u>See</u> <u>id.</u>) Petitioner thus has not met his burden of showing that an "extraordinary circumstance" prevented him from making a timely filing in spite of his exercise of proper diligence.

C.   <u>Ineffective Assistance of Counsel</u>

Lastly, although, as discussed above, Petitioner's legal arguments conflate various different legal concepts, he appears to maintain that his trial counsel provided ineffective assistance of counsel, because counsel 1) improperly allowed the prosecution to

18

use a co-defendant's out-of-court statement as a factual basis for Petitioner's guilty plea (see Docket Entry 2 at 9-11; see also Docket Entry 8 at 4, 6-7, 10, 14); 2) told Petitioner the state would execute him if he did not plead guilty and showed Petitioner photographs of death row inmates to scare him into pleading guilty (see Docket Entry 1, ¶ 18; see also Docket Entry 2 at 6-10, 16-18; Docket Entry 8 at 3, 6); 3) conspired with the prosecutor at the time of the plea hearing to conceal the fact that the victim's wife had removed life support from the victim (see Docket Entry 1, ¶ 18; see also Docket Entry 2 at 3, 6-7, 18; Docket Entry 8 at 3, 5-6, 9, 10, 12, 13); and 4) did not develop mitigating evidence of Petitioner's low IQ and/or intellectual disability and took advantage of Petitioner's mental state at the plea hearing (see Docket Entry 2 at 9, 11; see also Docket Entry 8 at 6). Petitioner seemingly contends that his trial counsel's ineffective assistance amounts to both "structural error" (Docket Entry 2 at 11, 14; see also Docket Entry 8 at 2, 4, 10) and a "fundamental miscarriage of justice" (Docket Entry 2 at 20; see also Docket Entry 8 at 2, 5, 8, 11, 12, 13, 14, 16) that permits him to bypass the one-year statute of limitations (Docket Entry 8 at 2 (citing Weaver v. Massachusetts, ___ U.S. ___, 137 S. Ct. 1899 (2017))). Petitioner's argument fails for three reasons.

First, Petitioner incorrectly views the structural error doctrine as a means to sidestep the applicable statute of

limitations.  (See Docket Entry 2 at 11, 14; see also Docket Entry

8 at 2, 4, 10.)  The United States Supreme Court explained the

import of the structural error doctrine in Weaver:

> [S]ome errors should not be deemed harmless beyond a
> reasonable doubt. These errors came to be known as
> structural errors. The purpose of the structural error
> doctrine is to ensure insistence on certain basic,
> constitutional guarantees that should define the
> framework of any criminal trial. Thus, the defining
> feature of a structural error is that it affects the
> framework within which the trial proceeds, rather than
> being simply an error in the trial process itself. For
> the same reason, a structural error defies analysis by
> harmless error standards. . . . Despite its name, the
> term "structural error" carries with it no talismanic
> significance as a doctrinal matter. It means only that
> the government is not entitled to deprive the defendant
> of a new trial by showing that the error was harmless
> beyond a reasonable doubt.

Weaver, ___ U.S. at ___-___, 137 S. Ct. at 1907-10 (internal

citations, quotation marks, and brackets omitted).  Thus, a

structural error in the framework of a trial precludes the state

from arguing that the error qualifies as harmless, but does not

impact the separate and distinct issue of the timeliness of a

federal petition under Section 2254, see Lindsay v. United States,

No. CV 18-17581, 2019 WL 4169013, at *2 (D.N.J. Sept. 3, 2019)

(unpublished) ("Petitioner asserts in his motion that he should be

permitted to evade the time bar because he believes he is raising

claims for structural errors and structural error holds no

limitation.  Petitioner provides no caselaw in support of such an

assertion, and th[e c]ourt is aware of none.  Indeed, what little

caselaw exists suggests that structural errors are not immune to

the statute of limitations." (citing <u>Dedona v. United States</u>, No. 08-2046, 2009 WL 2778386, at *4-5 (D.N.J. Aug. 31, 2009) (unpublished))).

Second, Petitioner mistakenly believes that his allegations of ineffective assistance of trial counsel demonstrate a "fundamental miscarriage of justice" sufficient to bypass the one-year limitations period. (Docket Entry 2 at 20; <u>see also</u> Docket Entry 8 at 2, 5, 8, 11, 12, 13, 14, 16.)  However, contrary to Petitioner's beliefs, the legal concept of "fundamental miscarriage of justice" does not constitute a level of severity applicable to any alleged constitutional error which, once reached, entitles a petitioner to bypass the statute of limitations.  Rather, the fundamental "miscarriage of justice exception applies to [the] severely confined category" of actual innocence claims, <u>McQuiggin</u>, 569 U.S. at 394-95, to ensure "'that federal constitutional errors do not result in the incarceration of <u>innocent</u> persons,'" <u>id.</u> at 400 (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993)). Because, as discussed <u>supra</u>, Petitioner's actual innocence claim fails as a matter of law, he cannot invoke the "fundamental miscarriage of justice" exception to the statute of limitations.

Third, although, as a general matter, circumstances <u>might</u> exist where ineffective assistance of trial counsel provides grounds for equitable tolling, Petitioner has not shown how any of the alleged errors by his trial counsel, all of which allegedly

21

occurred at or before the time of his guilty plea, affected his subsequent ability to timely file the instant Petition (see generally Docket Entries 1, 2, 8). Equitable tolling thus does not apply in this context. See generally Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000) (holding that error by trial counsel even in interpreting statute of limitations did not present extraordinary circumstances necessary to invoke equitable tolling); Hinton v. Williams, No. CV 5:18-2617, 2020 WL 1027337, at *3 (D.S.C. Mar. 3, 2020) (unpublished) (rejecting equitable tolling and noting that "[a]ny difficulties that [post-conviction] counsel had in obtaining a complete copy of [the p]etitioner's trial counsel's file did not prevent [post-conviction] counsel from timely filing an extensive [post-conviction] application in state court, nor did they prevent federal habeas counsel from timely filing the instant petition").

In sum, Petitioner cannot avoid the statute of limitations in this case.

## IV. **Conclusion**

The statute of limitations bars the instant Petition.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion to Dismiss (Docket Entry 5) be granted, that the Petition (Docket

22

Entry 1) be dismissed, and that a judgment be entered dismissing this action, without issuance of a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 5, 2020